**In the Matter of the Complaint of the F/V CAPT. WOOL, INC., as Owner of the F/V Capt. Wool, for Exoneration from or Limitation of Liability.**

Civil Action No. 4:93cv45.

United States District Court,
E.D. Virginia, Newport News Division.

May 26, 1995.

Patrick Michael Brogan, Davey Associates, P.C., Norfolk, VA, Philip Norton Davey, Davey Associates, P.C., Norfolk, VA, for plaintiff.

Jesse Marden Suit, III, Rutter & Montagna, Norfolk, VA, James Gregory Hurley, Jr., Rutter & Montagna, Norfolk, VA, for John R. Trevino.

Jesse Marden Suit, III, Rutter & Montagna, Norfolk, VA, David B. Kaplan, The Kap-

lan/Bond Group, Boston, MA, for David Charity.

John Early Holloway, Hunton & Williams, Norfolk, VA, Kenneth Reed Mayo, Andrew Jackson Timms, Hunton & Williams, Norfolk, VA, for Virginia Queen Associates.

Kenneth Reed Mayo, Andrew Jackson Timms, Hunton & Williams, Norfolk, VA, for Gloucester Seafood of Virginia, Inc.

### FINAL ORDER AND OPINION

DOUMAR, District Judge.

This matter currently is before the Court in a bench trial pursuant to the court's admiralty jurisdiction to determine whether and to what extent John R. Trevino and David Charity, claimants to this limitation of liability action, were injured when the F/V CAPT. WOOL and the F/V VIRGINIA QUEEN collided at sea on September 8, 1992.

### I. FACTS AND PROCEDURAL BACKGROUND

#### A. Parties and Claims

On September 8, 1992, the F/V VIRGINIA QUEEN and F/V CAPT. WOOL collided at sea about 60 miles off the coast of New York. Both vessels had been dredging for scallops in the area. Plaintiff F.V. Capt. Wool, Inc., is the owner of the F/V CAPT. WOOL. Claimant Virginia Queen Associates is owner of the F/V VIRGINIA QUEEN and that vessel was chartered at all relevant times to claimant Gloucester Seafood of Virginia, Inc., under a bareboat charter. Claimants John R. Trevino and David Charity were fisherman working aboard the F/V CAPT. WOOL at the time of the collision. The owners of the two vessels settled their claims with each other and a stipulation was filed on March 21, 1994, that the collision was caused by the equal navigational fault of each vessel, without the privity or knowledge of the vessel owners. This stipulation by the parties conceded liability by the two vessel owners for the provable damages of Trevino and Charity. The liability, if any, of F/V Capt. Wool, Inc., to both Trevino and Charity was not to exceed the stipulated sum of $250,000. Likewise, the collective liability of Gloucester Sea-

food and Virginia Queen Associates to both Trevino and Charity was not to exceed the stipulated amount of $250,000. Trevino's and Charity's recovery is thus limited to a maximum collective total recovery not to exceed $500,000 against any party to these proceedings. For purposes of ease of reference within this opinion, Trevino and Charity may be referred to as "claimant(s)" while the vessel owners and operators may be referred to as "defendant(s)."

#### B. Issue

This case is essentially about the extent of provable damages Trevino and Charity suffered as a result of personal injuries sustained when they fell to the deck of the F/V CAPT. WOOL because of the collision. Both men claim that they suffer from permanent and disabling back injuries as a result of falling to the deck during the collision. As detailed below, the court FINDS that the claimants have not met their burden of proving the full amount of the damages they claim. The court FINDS that the weight of the evidence discloses that both men suffered acute lumbar strains as a result of the accident and that no permanent injury or disability is causally linked to the collision.

#### C. Findings of Fact

Following discovery and pretrial motions, a bench trial was begun on May 18, 1994. Arguments were heard and evidence was presented over four days through May 26, 1994. Several experts testified. The parties' experts at trial directly contradicted each other concerning their diagnoses and prognoses of the spinal injuries suffered. In addition, an issue arose concerning whether inappropriate, unnecessary, and expensive procedures were being ordered in the claimants' cases by Dr. Lawrence R. Morales, an orthopedic surgeon in the Tidewater area. These procedures were usually performed by Dr. Morales or at facilities in which Dr. Morales had ownership interests. The court thus appointed Dr. John A. Cardea, Chairman of the Department of Orthopedic Surgery of the Medical College of Virginia as an medical expert from lists provided by the

parties [1] pursuant to a Rule 706 of the Federal Rules of Evidence.[2] The court requested that Dr. Cardea review the medical records of the claimants and opine as to the extent of injuries and their permanence and review whether all of the medical treatments and various tests ordered were reasonable and necessary and whether the charges therefor were reasonable. The court and parties having received his report, the court inquired of the parties as to whether they would stipulate that Dr. Cardea's testimony would be in all essential respects the same as his report and whether any cross-examination of Dr. Cardea was desired by any party. All parties so stipulated and no party desired to cross-examine Dr. Cardea. The court then invited post-trial memoranda and scheduled final arguments, which were heard on January 25, 1995. The following roughly chronological findings of fact will be organized separately for each claimant.

### 1. Claimant Trevino

Claimant John R. Trevino was 39 years of age when the accident occurred on September 8, 1992. Trevino testified that he graduated from high school but did not go to college. He first worked in a tool room and then trained for the skill of pipe fitting. In 1984, he left the company with whom he trained to work for other construction companies as a pipe fitter, and sometime that year Trevino began working on scallop boats. In 1985, Trevino went into commercial fishing full time. Two years prior to the accident in question, Trevino sustained a work-related back strain which caused him to miss 36 days of work before he fully recovered. At the time of the accident in question, Trevino had worked for F/V Capt. Wool, Inc. for

five or six years. Trevino's 1099 tax forms indicate that he earned the following for commercial fishing: $11,867.25 in 1989; $10,949.48 in 1990; $8,560.89 in 1991; and $18,867.76 up until the accident in 1992. By the time of the accident, Trevino was the first mate on the F/V CAPT. WOOL.

At the time of the collision on September 8, 1992, Trevino was at the port side winch. He was attempting to run inside when the collision threw him against the air conditioner door and onto the deck. Trevino reported the injury to Captain Robert Robles. After the collision, the boat was at sea for 30–38 hours before coming into Hampton, Virginia. On September 10, 1992, Trevino sought medical treatment at Sentara Hampton General Hospital.

The "Emergency Assessment Triage Sheet" at Hampton General was filled out reflecting that Trevino complained of lower back pain. This sheet reflected no visible trauma at the injury site. The Treatment Record for the Hampton General visit also reflects that the patient complained of low back pain. There was no complaint recorded of radiating pain into the legs. X-rays of the lumbar region were taken which revealed "degenerative joint and disc disease, most marked at L4–5, otherwise negative." (Ex. 25.) Degenerative disc disease was agreed by all experts to be naturally caused and not a result of any trauma associated with the accident. No disc herniation was revealed by the X-rays. A straight leg raising test was also negative for the presence of a pinched or irritated nerve. The expert testimony and exhibits before the court indicated that herniated discs pinch or irritate nerves running

---

1. Dr. Cardea was named on a list submitted by counsel for both claimants as well as on a list submitted by counsel for F/V Capt. Wool, Inc. and a list submitted by counsel for Virginia Queen Associates and Gloucester Seafood.

2. Fed.R.Evid. 706(a) provides:

Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witness agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witnesses shall

not be appointed by the court unless the witness consents to the act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

from the spine into the legs and normally cause positive straight leg raising test results, as well as a strong sensation of pain radiating down the sciatic nerve of the leg on one side. Straight leg raising tests given to the claimants become important to the court's decision because in both claimants' cases, numerous physicians or therapists performed these tests multiple times but only those performed by Dr. Morales in both men's cases were ever positive for sciatic (or radiating) pain.[3] Trevino was diagnosed at Hampton General as having an "acute lumbar strain." (Ex. 25). Trevino was prescribed a muscle relaxant and pain reliever and released.

### a. Dr. James Phillips

Dr. Phillips' testimony was presented via deposition. Following their emergency assessments, Dr. Phillips initially treated both men. Dr. Phillips has been a practicing orthopedic surgeon since he completed his training at the Johns Hopkins Hospital in Baltimore in 1971. He then spent two years at the National Naval Medical Center in Bethesda, Maryland, and in 1973 he began practice in Hampton and Newport News. Dr. Phillips is board certified in his specialty of orthopedic surgery, and practices with Tidewater Orthopaedic Associates, Inc.

Dr. Phillips first saw Trevino on September 18, 1992. Trevino was referred by his employer and brought his X-rays from Hampton General. Dr. Phillips reviewed the films himself and determined that the X-rays revealed degenerative joint disease at L4–5. Dr. Phillips agreed that this condition is part of a normal aging process. Dr. Phillips did not see a bruise or other mark on the patient's back. Trevino had complained to the nurse at Dr. Phillips' office of pain in *both* of his legs[4] but Dr. Phillips did not think any leg pain was mentioned to him; none was recorded in his notes. Dr. Phillips noted the presence of muscle spasms in the lower back on this first visit. He also found forward flexion (bending) and lateral bending limited. Dr. Phillips performed various sensory tests; he found knee and ankle reflexes normal, no sensory deficit or motor weakness, and standing on toes and heels normal. A straight leg raising test and reverse straight leg raising test both were normal, indicating that Trevino did not have a pinched or irritated nerve. Dr. Phillips' diagnosis was that Trevino "had strained his low back, that he had arthritis at his L–4, 5 space, with disk degeneration, and that I didn't think his arthritis was the cause of his pain, but rather he had the back strain, and I sent him for therapy and had him stay out of work." (Dep. at 10). Dr. Phillips describes a back strain as a pulling of muscles and the ligamentous attachments between the joints, causing pain, stiffness, and muscle spasm. He concluded that the symptoms he observed were due to low back strain, and Dr. Phillips' opinion was that if the symptoms are all due to low back strain, he would expect the condition to resolve over time. Dr. Phillips prescribed a continuation of the medicine Trevino was taking, physical therapy three times per week for three weeks, and for Trevino to stay out of work. The therapy was prescribed at Tidewater Physical Therapy & Sports Therapy Center, Inc. ("TPT"), in their location in Newport News, Virginia.

*Physical therapy results and improvement while in the care of Dr. Phillips.* Trevino began his physical therapy at TPT on September 21, 1992, based on the prescription of Dr. Phillips.[5] Trevino admitted in his testimony that he improved during his physical therapy sessions during the time that he was under Dr. Phillips' care. Jonathan Suttles, a licensed physical therapist, most often worked with Trevino. Suttles testified at trial and the records and reports from TPT were introduced as Exhibit 33. Upon beginning physical therapy at TPT, the records

---

**3.** A straight leg raising test on Trevino done by Dr. Arthur Wardell was negative for any radiating pain but positive for lower back pain. The roles in the case and findings of Dr. Morales, Dr. Wardell, and other physicians are described in more detail *infra.*

**4.** Radiating pain from a disc herniation impinging on a nerve typically runs down one leg only. *See supra.*

**5.** Testimony indicated that to obtain physical therapy services a patient must be referred from a medical doctor, chiropractor, podiatrist, or dentist.

indicate that Trevino complained of pain in his back with tingling into the anterior and posterior thigh regions. Trevino rated his pain as a seven on a ten point scale. Another straight leg raising test was performed by Suttles and the result was negative. On September 25, 1992, the first of the weekly status reports showed Trevino progressing; his range of motion and strength were increasing and his pain was decreasing. This progress continued for the next five weeks while Trevino was under the care of Dr. Phillips. Suttles' testimony confirmed the steady improvement in Trevino's condition as revealed by the records. (Tr. at 21–22).

On October 2, 1992, the record for the physical therapy session, this one conducted by a therapist other than Suttles, reveals an entry stating that there appeared a "burn spot just distal to waist line—hot pipe on boat." (Ex. 33). This burn spot was never seen in any of the previous exams, where no marks or other external signs of injury were ever noted. This report to the physical therapist raises the strong possibility that Trevino was in fact on a boat (against Dr. Phillips' orders) at this time while he was progressing in his therapy. At trial, Trevino testified that he received this burn, noted by the therapist as occurring from a hot pipe on a boat, from sleeping on a heating pad. He said he had been burned in 1990 or 1991 on a boat, however. On October 7, 1992, Trevino was seen again by Suttles. Suttles noticed the burn. Suttles' report for that date states: "Report observ.: Central burn at L5 s, Pt. stated he leaned into a hot pipe last week and burned himself." (Ex. 33). After sitting through the testimony and reviewing the evidence, the court finds the later trial testimony of Trevino that the cause of the burn was sleeping on a heating pad simply not credible as compared to Trevino's con-

temporaneous reports to the various therapists as recorded in the records, which indicated that he burned himself by contact with a hot pipe on a boat. The court accepts the evidence of the contemporaneous reports of Trevino that he burned himself by leaning into a hot pipe on a boat after the accident in question and sometime just prior to his October 1st physical therapy session.[6]

The testimony of Suttles and the therapy records indicate that progress was reported on October 2, 1992 in increasing strength and decreasing pain, and progress was reported on October 5, 1992 in increasing strength, decreasing pain, and increasing range of motion. The October 5, 1992 status report records pain as being at a level six on a scale of ten, a reduction since beginning therapy.

On October 5, 1992, Trevino returned to Dr. Phillips' office for a follow-up examination. The following is Dr. Phillips' record of the visit:

> Mr. Trevino is improving. He has not completed his therapy. He still complains of low back pains and has limited forward flexion at 60 degrees, lateral bending and extension are normal. He has no weakness or numbness in the lower extremities.
>
> IMPRESSION: Lumbosacral strain and arthritis.
>
> He will continue with his therapy. He will get a back brace. He will continue with his present medical medications. Stay out of work. Return in three weeks.

(Ex. 26). Dr. Phillips' deposition testimony confirmed his recorded findings. (Dep. at 11).

Meanwhile, Trevino continued to show improvement at his physical therapy sessions. The weekly status report dated October 10,

---

6. In this regard, the court also notes that Trevino was absent from his physical therapy session four times during his period of improvement in October of 1992, and three times in November, although no absences occurred prior to October 9, 1992 which was after the burn occurred. The court thus does not say with certainty that Trevino was working on a boat against Dr. Phillips' orders when he was burned, but the court does find that Trevino sustained the burn while on a boat, contrary to his later trial testimony.

Trevino's general testimony as to his working after the accident was that he has worked very little since the accident. He stated that he worked for half of one day as a painter, but could not continue because of the pain. He has made some money cleaning a woman's apartment. He claimed that he sought employment in maintenance/janitorial services at various businesses, but found that they were not hiring or that they required heavy labor. Trevino also testified that he can no longer participate in his hobbies of softball, basketball, and skiing.

1992 again showed patient progress in all three reported areas: increasing range of motion, increasing strength, and decreasing pain. The weekly status report dated October 16, 1992 shows the patient progressing in all four reported areas: increasing range of motion, increasing strength, decreasing pain, and improving ambulation. The daily report for October 12, 1992, however, did note Trevino's subjective complaints that the right side was still sore, that the left side was feeling worse, and that he was dragging his left lower extremity. The weekly status report dated October 23, 1992 again shows Trevino progressing in all four reported areas of increasing range of motion, increasing strength, decreasing pain, and improving ambulation. The daily report for October 20, 1992 states that there was "no c/o ["complaint of"] back pain today." (Ex. 33).

### b. Transition from Dr. Phillips to Dr. Lawrence R. Morales

In late October 1992, Trevino must have begun a transition from the care of Dr. Phillips, under whose care the records and testimony showed that Trevino had steadily improved, to the care of Dr. Lawrence R. Morales. Also in late October, Trevino suddenly began to report increasing pain, and, for the first time since his initial report of tingling in his thighs, pain radiating to his lower extremities. Trevino testified that he was referred to Dr. Morales from Rafael Hernandez, a shipmate on the CAPT. WOOL. Dr. Morales, whose testimony was via deposition, also testified that a shipmate referred Trevino. Dr. Morales' record of Trevino's first documented visit on November 17th also states that Hernandez referred Trevino. (Ex. 31). On cross-examination of Trevino, it was revealed that there was an indication from an earlier deposition that Hernandez was in the same situation, i.e., had a lawsuit pending. Trevino also stated on cross-examination that his lawyer may have made the first appointment with Dr. Morales. Trevino admitted that he made no effort to see an orthopedist or neurologist anywhere on the Peninsula after leaving the care of Dr. Phillips, even though Trevino lived in Yorktown, Virginia, did not own a car, and Dr. Morales' office was in Chesapeake, Virginia.[7] In light of the foregoing as well as the events described below, the court finds as a fact that the choice of Dr. Morales to treat Trevino was motivated in large part by litigation-related concerns as opposed to more purely medical considerations.

In addition, the court must express its concern about some other details of this transition. On October 30, 1992, Trevino canceled his scheduled physical therapy session, stating he had "other things to do today." (Ex. 33). On that day, October 30, 1992, Dr. Morales prescribed four weeks of physical therapy for Trevino. (Ex. 33).[8] As previously mentioned, physical therapy such as that undertaken by Trevino is pursuant to a physician's prescription. Yet Trevino and Dr. Morales both testified that Trevino was never examined by Dr. Morales until November 17, 1992. Dr. Morales' records also show November 17th as the first office visit by Trevino. Trevino's own expert testified that it was unacceptable medical practice to prescribe physical therapy for a patient whom the physician has not examined. (Tr. of testimony of Dr. Arthur W. Wardell at 31). Moreover, the record of this prescription given by Dr. Morales was never produced by Dr. Morales' office pursuant to discovery requests for all records of treatments, but only came to light via the production from TPT of physical therapy records. There was another irregularity in the record keeping of Dr. Morales, described *infra*, which when combined with this incident, casts doubt on the veracity and completeness of the medical records maintained on the claimants by Dr. Morales. In any case, it appears clear that Dr. Morales prescribed four weeks of physi-

---

7. Thus, Trevino would travel from the northern portion of the Tidewater area, located well north of Hampton Roads, to the southern portion of the Tidewater area, well south of Hampton Roads. To the contrary, Dr. Phillips' practice is located on the Peninsula, with offices in Hampton and Newport News.

8. The prescription itself, executed by Dr. Morales, was delivered to the physical therapy facility.

cal therapy, at an average cost in this case of $100 to $120 a visit, on a patient that he had never examined, or on another doctor's patient, all the while maintaining no record of a prescription to or visit by the patient.[9]

During (and after) this transition period in October of 1992, the slow but steady progress during physical therapy came to a halt. On October 27th and 30th, Trevino canceled his scheduled therapy appointments, although the appointment scheduled for the 27th was apparently rescheduled. On October 29th, Trevino complained of pain radiating into the *right* leg to the knee,[10] and pain at a level of 7–8. A report to Dr. Phillips dated October 29th reports this new complaint of radiating pain and shows for the first time "status unchanged" in the newly applicable category of "decrease radicular symptoms", as well as showing status unchanged for the decrease of pain. A similar weekly status report was prepared on October 30th.

*Last visit by Trevino with Dr. Phillips.* On November 4, 1992, which was after Dr. Morales had prescribed an increase in Trevino's physical therapy the previous week, Trevino had what turned out to be his last visit with Dr. Phillips. Trevino complained of low back pain, and, according to Dr. Phillips' notes, Trevino did not complain to him about any radiating pain. Trevino also never complained to Dr. Phillips of pain in the thoracic area of the spine. Dr. Phillips' examination revealed that no muscle spasms were then present, although he had detected such spasms in Trevino's back during his first visit on September 18th. The significance of this,

according to Dr. Phillips, is that Trevino "had improved over that period of time." (Dep. at 18). Trevino had some limitation of motion in his back and diffuse tenderness. A straight leg raising test and a reverse straight leg raising test were negative. Dr. Phillips did not find any weakness, numbness, or atrophy of the lower extremities, and he diagnosed "resolving back strain which aggravated his preexisting degenerative arthritis." (Dep. at 12). Dr. Phillips prescribed continued therapy,[11] some changes in medication, and told Trevino to stay out of work for a month. The following exchange regarding the November 4th visit also took place on direct examination:

Q. I also notice from your note that you've got here voluntary limitation of lumbar motion.

A. It was my impression that he was limiting it of his own volition. I'm not certain why he limited it, possibly because it was painful, but it was my feeling that he was not making his best effort to try to move his back.

Q. How can you tell in an examination?

A. Because I've been doing it for 20 years and I think I can tell when somebody is making his best effort and when he isn't, and that's really about all I can say about it.

(Dep. at 12). Dr. Phillips testified that he had no reason to believe from the November 4th examination that Trevino would not be fit for duty on December 7, 1992, the date for which he cleared Trevino to return to work. (Dep. at 18).

---

9. Trevino usually went three times per week. It might be argued that Dr. Morales was aware of the existing order for physical therapy by Dr. Phillips and sought that there be no interruption of therapy. This explanation does not excuse the lack of an examination of the patient, however, particularly in light of the fact that at the relevant times Trevino had prescriptions in place at TPT from Dr. Phillips. Indeed, when Trevino returned to see Dr. Phillips on November 4th, Dr. Phillips again prescribed four weeks of physical therapy, clearly unaware that Dr. Morales had prescribed four weeks on October 30th.

10. The later complaints of radiating pain were down the *left* leg. Experts testified that the radiating pain from a disc injury is down one leg or

the other, but does not move from leg to leg. As described *infra*, the court accepts this testimony. This does not necessarily mean the pain does not exist, but rather indicates that it is subjective muscular pain from a back strain and not indicative of disc damage or nerve root irritation.

11. In conjunction with the examination, Dr. Phillips prescribed on November 4th a continuation of the therapy for four weeks that he had previously ordered. The prescription appears at Ex. 33, dated November 4, 1992. Dr. Phillips was obviously unaware that Trevino had by then obtained a prescription for physical therapy from Dr. Morales, possibly without any examination. All of Dr. Phillips prescriptions were provided subsequent to physical examinations.

On cross-examination, Dr. Phillips confirmed that Trevino received an injury in the collision severe enough to keep him out of work from at least September 18th, 1992, the date of the first visit, to December 4th, 1992. Dr. Phillips also stated that he had not received any medical records concerning treatment Trevino may have received subsequent to Trevino's last visit to his office on November 4th. In response to counsel's question about whether he would defer to Dr. Morales' treatment of Trevino subsequent to this last visit, Dr. Phillips responded that he would.

The court finds credible Dr. Phillips testimony about the nature of Trevino's condition—a resolving back strain, which was caused by the collision, superimposed upon a degenerative back condition. Although the court has no doubt that Dr. Phillips would in fact defer to a later treating physician regarding later treatments, the court attaches little weight to this finding. It would be extraordinary for Dr. Phillips to answer otherwise, as he would have no basis for not deferring because he was no longer involved with the patient.

On November 6, 1992, Trevino canceled his scheduled physical therapy session because "he was in Norfolk at his attorney's office & could not make it here." (Ex. 33). On November 11, 1992, TPT and Dr. Morales' office received authorizations for release of all medical records to the law firm representing Trevino. It is thus clear that by this time Dr. Morales was considered by Trevino and the law firm representing Trevino to be Trevino's physician, although Dr. Morales testified that he had not yet seen the patient. Just prior to Trevino's first recorded visit with Dr. Morales, but after a prescription executed by Dr. Morales for physical therapy, the physical therapy records again report a lack of progress. The weekly status report dated November 13th states that the patient was progressing in a number of areas, but the status was unchanged with regard to "increased range of motion" and "decrease pain." The comments state that patient "continues to [complain of] pain at L-spine yet is able to perform gym exercises." (Ex. 33). The physical therapy status report dat-

ed November 16th, the day before Trevino's alleged first visit with Dr. Morales, is addressed now to Dr. Morales rather than Dr. Phillips. Clearly, the written reports made at the time rebut the oral testimony as to the time of the inception of the physician/patient relationship. The report to Dr. Morales indicates the patient's status unchanged in the category of decreasing pain. It also states for the first time that the patient "complains of [*left* lower extremity] 'tingling' to the posterior thigh." (Ex. 33) (emphasis added). This is the first report of radiating pain down the *left* leg only, and it is based on a complaint made at therapy on November 16th, on which date Trevino also rated his pain as being at 8 on a scale of 10. The transition from the care of Dr. Phillips to that of Dr. Morales clearly was now complete, no matter whose testimony or evidence is considered.

### c. Dr. Lawrence R. Morales

As did Dr. Phillips, Dr. Morales testified via deposition. Dr. Morales has testified numerous times in this court in similar cases. This court, as detailed herein, frankly finds the testimony and diagnostic findings of Dr. Morales to be contrary to documentary evidence and to lack credibility when compared to the other evidence, and the court also finds that the majority of the expensive procedures and tests he ordered were not medically necessary. In reaching these ultimate conclusions, the court relies on the weight of the other medical testimony in the case, which was largely consistent and contradictory to that of Dr. Morales on these issues. The contradictory findings of these other physicians (other than Dr. Phillips and the Sentara Hampton General emergency room which have already been discussed) follows this recounting of treatments performed and findings made by Dr. Morales.

Dr. Morales attended the Lausanne Medical School in Switzerland. He received his orthopedic-surgical training in a combined program between the New York Medical College and the U.S. Public Health Service Hospital in Staten Island, New York. He became the assistant chief of the Department of Orthopedic Surgery at the U.S. Public Health Service Hospital in Norfolk, Virginia,

then chief of that department until the hospital closed in October of 1981. Dr. Morales then went into the private practice of orthopedic surgery in Chesapeake, Virginia. He has been board certified in orthopedic surgery since 1978. Dr. Morales estimated that he spends four to five hours per week testifying in court cases. On cross-examination Dr. Morales confirmed that he attended medical school in Switzerland because he had difficulty getting into a medical school in the United States and that he had lost his medical privileges at what was at that time Norfolk General Hospital,[12] because of a failure to complete properly some paperwork. The court attaches little weight to these particular background facts, however, because they are unrelated to this case. On the other hand, there are discrepancies in the records in this case which the court does consider significant, including the lack of a record of having given the first prescription for physical therapy while prescribing such therapy without any record of an examination of the patient.

Dr. Morales states that he first examined Trevino on November 17, 1992. His recorded findings are located at Ex. 31. Dr. Morales testified that Trevino stated that he "was unable to see Dr. Phillips and was referred by a shipmate after he heard that I considerable experience with related injuries." (Dep. at 30). His record of the visit contains the notation that "This 39 year old patient is referred by Rafael Hernandez, a shipmate, because of persistent low back pain with pain radiating down the left leg." (Ex. 31). To the extent that Trevino may have reported the *radiating* pain down the left leg as "persistent," as opposed to the lower back pain, the record of his previous treatment does not support the claim, as the first specific recorded complaint report of left leg only radiating pain was made just the previous day at physical therapy. Dr. Morales made a number of positive findings at this examination which were not corroborated by any of the other physicians or clinicians who examined Trevino at various times. The following is the record of his findings on November 17th:

Clinically, the patient has a decreased range of motion of the lumbar spine by approximately 50%. He has positive straight leg raising on the left at 60 to 70 degrees [normal is 90 degrees]. He has a positive Lasegue's on the left. There is a diminished sensation over the left S1 dermatome in comparison to the right. There is decreased repetitive heel raising on the left in comparison to the right. There is a full pain-free range of motion of the hip, knee, and the ankle, although the hip has some pain in abduction and at the extremes of internal and external rotation.

The patient's physical therapy note of 11/16/92 verified that the patient has been complaining of left leg pain and tingling in the posterior thigh.

On X–RAYS [these were the previously taken X-rays brought to the exam by Trevino] the patient has degenerative disc space at L4–L5 level with some mild arthritic changes.

The patient will undergo neurodiagnostic testing and return for followup.

(Ex. 31). Dr. Morales diagnosed low back pain with radiculopathy. He prescribed more physical therapy (which prescription a record of appears in the records produced by his office during discovery) and planned to do followup testing. Dr. Morales testified at his deposition that Trevino also exhibited muscle spasms at this visit, *see* (Dep. at 31), although no record of this finding was recorded at the time. At physical therapy on November 24th, however, the therapist noticed a muscular "trigger point," which is a muscular knot, somewhat different than a muscle spasm. (Ex. 33 and Dep. of Suttles at 45–46). The court does find that at this point in time Trevino was still suffering the effects of a muscle strain caused by the accident and was unable to return to work. Whether the incident of the burn on the back "on a boat" contributed to this symptomology is impossible to determine. Dr. Morales' ultimate diagnosis, however, went far beyond an acute muscle strain.

12. Norfolk General is now Sentara Norfolk General Hospital, and this institution controls several other hospitals in the Tidewater area.

On November 30, 1992, Dr. Morales referred Trevino for two MRI studies at MRI of Chesapeake, Inc., a facility outside his office practice in which Dr. Morales has a substantial ownership interest and for which he served as the sole director as well as the corporate president, secretary, and treasurer in 1992.[13] In 1992, the American Medical Association (AMA) Code of Medical Ethics, Current Opinions, provided that "in general, physicians should not refer patients to a health care facility which is outside their office practice and at which they do not directly provide care or services when they have an investment interest in that facility."[14] Dr. Morales testified that these AMA self-referral canons did not apply to him because he was not a member of the AMA. (Dep. at 9–10). He also stated:

I'm a member of the American Academy of Orthopedic Surgeons ... who have addressed that issue and who stated that the orthopedic surgeons having the diagnostic and curative tools of the trade is necessary and ethical. The State of Virginia finds that it is acceptable and ethical and legal, provided that the patient is told that there are alternate choices for treatment.

(Dep. at 9–10). Other physicians also essentially indicated that what is permitted by law in Virginia is considered ethical in the practice of medicine. *See* Report of Dr. Cardea at 5:

To my knowledge of the ethics in the State of Virginia, it was not unethical for Dr. Morales to order test [sic] in the circumstances in Chesapeake in 1992.... Even though the hospital had put in a MRI, the most that Dr. Morales would have to do to comply with all ethical standards would be to advise the patient that he had some financial interest in the MRI. In the State

of Virginia it appears in medicine as in aspects of life that if it is not illegal it isn't unethical.... Any statements made by the American Medical Association or the American Academy of Orthopaedic Surgeons are strictly guidelines.

Dr. Cardea goes on to note however:

There is no question in my mind that a doctor of any nature refers a patient to have x-rays more quickly if they own the machinery and do profit from it. This has been reported in the literature and the use of simple x-ray is quoted in the radiology literature as being four times greater in offices that have radiographic equipment as to those that refer out to pure radiology practices.

(Report at 5–6). The court must express some distress over the current state of medical ethics in the Commonwealth if such ethics are essentially equivalent to whatever the General Assembly disallows or permits. It appears that the medical profession has followed other professions down the road toward becoming an industry ethically indistinguishable from any other activity. In any case, the fact that many tests and procedures on the claimants ordered by Dr. Morales were performed by facilities in which the doctor had a financial interest is a factor among others that the court finds relevant in its consideration of whether such tests and procedures were necessary and reasonable medical expenses.

Of the two MRIs on November 30th ordered by Dr. Morales on Trevino, one was for the lumbar (lower) region of the spine and one was for the thoracic (middle) region of the spine. There were no previous reports by Trevino of mid-back pain. And, in fact, the MRI of the lumbar spine showed at least two vertebra of the thoracic spine. All

---

**13.** The other corporate officer in 1992 was Dr. Nichols, who served as vice-president. (Dep. at 16). Dr. Nichols practices out of the same offices as Dr. Morales in Chesapeake.

**14.** AMA Code of Medical Ethics, Current Opinions, § 8.032 "Conflicts of Interest: Health Care Facility Ownership By a Physician" at 35 (1992), introduced as Ex. 45.

This section recognizes an exception where "there is a demonstrated need in the community for the facility and alternative financing is not

available. Need might exist where there is no facility of reasonable quality in the community or when use of existing facilities is onerous for patients." *Id.* Dr. Morales testified in his deposition that there were no "fixed-base" MRI facilities in Chesapeake at the time he started his facility, but that at the time the claimants underwent MRI, Chesapeake General had an MRI unit available which was the same distance from his office as his MRI of Chesapeake, Inc., facility— approximately a quarter mile. (Dep. at 12–13).

of the written records indicate that Trevino suffered from low back, or lumbar, pain. Yet the MRI results themselves indicated a history of mid-back pain. Dr. Cardea commented on the necessity of the thoracic MRI as follows:

> Regarding the necessity for a thoracic MRI, I have never heard of the practice. I have ordered thousands of MRI's of the lumbar spine. I feel that it is inappropriate to order a thoracic MRI for an evaluation of lumbosacral disc disease. The only conceivable purpose for this would be to rule out tumorous lesions at the area of the cauda equina and this can easily be done on the regular MRI which shows levels as t–10 or T–11 in the normal lumbar MRI. In my opinion the thoracic MRI was not necessary.

(Report at 6). Dr. Cardea's opinion was that the November 30th MRI of the lumbar area was necessary, given the history of pain following the accident.[15] Dr. Richard McAdam, who performed an independent medical exam on both claimants pursuant to Fed.R.Civ.P. 35, agreed in his testimony that the thoracic MRI of Trevino was not indicated:

> Q: Dr. Morales has expressed his opinion that the only way in which you could survey the lumbosacral spine is to do both thoracic and lumbar MRIs, that is to say two of them. Do you agree?
> A: To survey the lumbar spine, you need a thoracic MRI scan? Absolutely not. The MRI scan I showed you had the entire lumbar spine on it, on the lumbar spine scan I showed you. Why would you do a thoracic? There is no reason to. It is a different test of a different part of the anatomy.

(Tr. at 87–88). Dr. McAdam also felt that even the lumbar MRI scans were not necessary in the claimants' cases. However, the court finds compelling the report of Dr. Cardea that lumbar MRI is now the "gold standard" in the diagnosis of persistent back problems and notes that Dr. McAdam relied heavily on the lumbar MRI results in reaching his conclusions that neither man showed evidence of an objective, permanent disability. Accordingly, the court accepts the opin-ion of Dr. Cardea that an initial lumbar MRI was reasonably necessary in both men's cases, even though Dr. Morales may have been also motivated by financial gain in ordering the study. As to the thoracic MRI in Trevino's case, however, the court specifically finds that this procedure was completely unnecessary and that the only apparent motive for ordering the test was the profit motive.

The court notes that at various points in time, to counsel's credit, counsel for the claimants withdrew previously presented claims for various tests and procedures when it appeared that the evidence did not support the reasonableness or necessity of these claims. In order to understand the flavor of this case, however, the court feels constrained to detail the entire course of testing and treatment that the claimants underwent, primarily at the hands of Dr. Morales. Withdrawn claims will be so noted. The claim for Trevino's thoracic MRI was ultimately withdrawn. The cost for the lumbar and thoracic MRIs was $1060.00 each. This includes $800.00 charged by MRI of Chesapeake, and $260.00 for the radiologist for reading the MRI. The claimants eventually withdrew as claims all of the procedures and treatment ordered and/or performed by Dr. Morales which were found to be unnecessary by Dr. Cardea, except claims for physical therapy and chiropractic care.

Based on the lumbar MRI performed at his company MRI of Chesapeake, Dr. Morales diagnosed Trevino as suffering from a small central herniated disc at L4–5 in addition to degenerative disc disease. Dr. Ronald Washburn was the radiologist who read the MRIs and he noted in his report that the "findings are compatible with a small herniated disc." (Ex. 28). Dr. Washburn is the medical director of MRI of Chesapeake, and he testified at trial. The court notes that no other physician involved in this case, including Dr. Wardell, the plaintiff's expert who testified at trial, opined that the MRI in question showed disc herniation or that Trevino ever had a herniated disc. The court finds Dr. Washburn's testimony to be unpersuasive in other regards as well. The court

---

**15.** Dr. Cardea's evaluation of the results of this MRI can be found later in this opinion.

finds his testimony evasive, in light of his position as medical director, in regards to his knowledge of how MRI of Chesapeake was organized and administered, his contractual relationship with MRI of Chesapeake, and from where the company received its referrals, especially considering that each MRI request included the referring physician. *See* (Tr. at 273–80). The court finds as fact that the preponderance of the evidence clearly supports a finding that no disc herniation existed but that there was degenerative disc disease. The thoracic MRI, unsurprisingly, was normal.

*EMGs.* Dr. Morales also ordered an electromyogram (EMG) and nerve conduction study to be performed on Trevino on November 30th. This test, which records the contraction of muscles as a result of electrical stimulation, was done at Physical Therapy and Sports Medicine Center, Inc., a company incorporated by Dr. Morales, in which Dr. Morales has a financial interest, and which Dr. Morales serves as president and a director. The charge for the procedure was $430.00. Another EMG and nerve conduction study was ordered in January of 1994 at $420.00. Each test "revealed no significant electrophysiological abnormality in the nerves and myotomes sampled." (Ex. 29). Dr. Cardea stated that the tests were unnecessary in light of the availability of MRI and that "a well trained orthopaedic surgeon does not need to rely on an EMG and nerve conduction study to prove or disprove a ruptured disc." (Report at 2). Dr. Cardea further noted that

> The MRI on 11/30/92 shows the degenerative disc disease at L4–5 and at L5–S1 shows no nerve root impingement, whatsoever, and only a minor bulge which is normal finding for a degenerative disc at the level L4–5. There was no nerve root impingement seen on this test whatsoever, and therefore, no correlation with the leg pain.

(Report at 2). The claim for the EMG tests have been withdrawn.

*Thermograms.* On December 1, 1992, Trevino was referred by Dr. Morales for thermography tests, from which tests Dr. Morales initially diagnosed "sensory nerve fiber irritation." (Ex. 30). The testing was done at Thermodiagnostics of Virginia, a sole proprietorship owned by Dr. Morales and located in his offices in Chesapeake. (Ex. 55). The test essentially involves measuring temperature changes on the skin thought to be related to pain and nerve impingement. Dr. Morales charged $675.00 for the procedure.

The AMA House of Delegates adopted in June 1993 a recommendation of its Council on Scientific Affairs "That, in view of the lack of sufficient proof of effectiveness, it is the policy of the American Medical Association that the use of thermography for diagnostic purposes cannot be recommended at this time." (Ex. 48, AMA House of Delegates, *Proceedings* at 439, June 13–17, 1993, at 439). The AMA noted that "The possible value of thermography for the selected indications mentioned in the [earlier] 1987 Council on Scientific Affairs report is clouded by the misuse of this procedure." *Id.* Dr. McAdam and Trevino's expert Dr. Wardell both testified that thermography was not useful. (Tr. at 113–14 (McAdam); Tr. at 38 (Wardell)).

The court is aware that there can be differences of medical opinion regarding a procedure's validity, and that such opinions can change over time. Nevertheless, the court finds that at the least there was a consensus at the relevant time that thermography was often abused for financial gain. Indeed, the *Journal of the American Medical Association* stated in its April 8, 1992 issue:

> Virtually no one denies that thermography has been abused for profit. Court documents show that fees as high as $450 are charged [Dr. Morales charged *$675.00* ] despite the test's minimal costs, and often by physicians who own all or part of the thermographic equipment.

(Ex. 50, *AMA's Council on Scientific Affairs Takes a Fresh Look at Thermography,* 267 JAMA 1885, 1885 (1992)). The article specifically notes that "documents obtained in one case show that Norfolk, Va, orthopedic surgeon Lawrence Morales, MD, in 1988 made over $500,000 from thermograms alone." *Id.* Dr. Morales confirmed this information in his deposition. (Dep. at 26).

By the time of his deposition in February of 1994, Dr. Morales conceded that thermography was not a useful diagnostic tool. (Dep. at 23–24). Dr. Morales also stated that he did not rely in any degree on the thermograms performed on both claimants at the time that was treating them. (Dep. at 24). Not surprisingly, the claim for the cost of these procedures has been withdrawn. The court finds as a fact that the thermograms were not necessary in this case and that the charges initially sought therefore were patently unreasonable. These procedures thus support and intensify the claimed financial motivation of the physician in ordering tests and procedures.

*Office Visits/Shots.* On December 11, 1992, Trevino returned for an office visit with Dr. Morales. By the end of his treatment of Trevino, Dr. Morales had billed $6,411.00 for office visits, including charges for various shots. At the December 11th visit, Dr. Morales administered shots of Marcaine, a painkiller. He also recommended an epidural installation of the steroid cortisone, a hospital procedure. Dr. Cardea opined that these office visit costs were excessive for reasonable care of the lumbar spine. (Cardea Report at 6). Dr. Cardea also felt that the series of epidural steroid injections were indicated only for nerve root irritation, which was not present on the MRI, EMG, or nerve conduction study, and that of the series of these shots, "possibly the first steroid injection is indicated, but I see very little indication for those after the first." (Report at 3). However, Dr. Morales himself conceded however that "you would not give an epidural instillation of cortisone, a hospital procedure, to a sprained back." (Dep. at 82). He further stated that an "epidural steroid would only be given for a problem with the disc or problem with the nerve." (Dep. at 82). The court is concerned that not even the first epidural cortisone treatment was reasonable and necessary because it appears by Dr. Morales' own testimony to be based on his diagnosis which the court finds to be without support in the record and Dr. Cardea's endorsement of even the first procedure was equivocal. Nevertheless, the court will generally accept the report of Dr. Cardea on this matter as to the first epidural shot of cortisone.

The first epidural procedure (2 shots) was undertaken on December 16, 1992, at a hospital charge of $357.50, while Dr. Morales charged $750.00 for his services. There appears to have been three other epidural cortisone treatments up through January of 1994, at hospital charges ranging from $228.17 to $467.46. (Ex. 35). Dr. Morales charged $750.00 for his services each time. (Ex. 35). As per Dr. Cardea, the court finds these procedures not to have been indicated, and Trevino has now withdrawn his previously submitted claims for these procedures.

On December 30, 1992, Trevino returned to Dr. Morales for an office visit. He received more Marcaine shots. Dr. Morales still maintained a diagnosis of herniated disc and noted that "[t]he patient would like to try non-operative treatment at this time." (Ex. 31). As will be more detailed below, the court finds that the further treatment given by Dr. Morales after this point cannot be justified. Accordingly, the court finds reasonable and necessary the charges of Dr. Morales up until this point, including the office visit of December 30th. These reasonably necessary charges total $1,364.00 of the $6,411.00 originally claimed. (Ex. 35).

*Lumbar myelogram.* On January 20, 1993, Trevino returned to Dr. Morales for an office visit, and Dr. Morales recommended a lumbar myelogram, another hospital procedure. In light of the more useful MRI which had already been performed, Dr. Cardea stated that "I do not feel the myelogram in January on Mr. Trevino was necessary." (Cardea Report at 5). The hospital charge was $791.70, and Dr. Morales charged $500.00 for his services. The court agrees with Dr. Cardea that the procedure was not necessary, and the claim for this procedure has now been withdrawn.

*Synopsis of subsequent treatment by Dr. Morales.* Dr. Morales continued to see Trevino and continued to order physical therapy despite no indication of improvement since the initial improvement while Dr. Phillips was the referring physician. Dr. Cardea felt that this continuation of physical therapy was not justified:

This patient continued to fail in physical therapy. However, he remained in physical therapy for nearly a year. This is like giving an individual medicine that is doing no good, i.e., giving someone hypertensive medicine that does not relieve their hypertension. There were reports from the physical therapist that they were not gaining any progress on Mr. Trevino's care, however, he continued to be sent back to the [sic] at 3 week intervals.

(Report at 3). Dr. Cardea further noted:

I also feel that the physical therapy of $5,000–$6,000 was also excessive.... In my opinion a physical therapist is very important in the primary 6–12 weeks of a patient's care. Following that the patient can do [a] home exercise program which is taught by the therapist and only needs to seek physical therapy for muscle spasm management which requires deep heat and massage. These patients both had degenerative disc disease at L4–5 and L5–S1, and all of the physical therapy in the world was not going to increase the range of motion at those major segments.

(Report at 7). The claimants have not withdrawn their claims for the full amount of their physical therapy, which is for $6,390.00, but the court accepts the opinion of Dr. Cardea and finds that physical therapy beyond the end of December was not justified.[16]

Dr. Morales continued to see Trevino intermittently until April 11, 1994. Dr. Morales performed another lumbar MRI in January of 1994; the claim for this expensive procedure, which was opined by Dr. Cardea to have been unnecessary, has been withdrawn. In addition, Dr. Morales had another EMG and nerve conduction study performed that month; the claim for this procedure, considered unnecessary by Dr. Cardea, has also been withdrawn. Dr. Morales performed several straight leg raising tests over this course of treatment and always reported positive findings for leg pain. Dr. Morales ultimately testified in his deposition that Trevino had a herniated disc at L4–5, caused by his fall during the collision, that this condition was permanent, and that he could not return to work as a commercial fisherman. (Dep. at 54–56). In light of the testimony of the other experts and upon a review of all of the evidence in the case, the court totally rejects the conclusions of Dr. Morales, and as recounted above finds the majority of his testing and treatment of the patient to have been neither reasonable nor medically necessary.

### d. The fall down the stairs

Sometime before February 12, 1994, Trevino fell down some stairs and sprained his wrist and strained the anterior cruciate ligament of his left knee. Trevino testified that this fall occurred sometime in mid 1993. However, it is clear from the physical therapy medical bills that Trevino began treatment for this injury on February 12, 1993. (Ex. 35). What most concerns the court regarding this injury, however, is that Trevino testified that he never told these doctors or the lawyer handling this case of this fall and his subsequent treatment, and that he received physical therapy for it at a separate location, Williamsburg Physical Therapy ("WPT"), under a different patient account number, rather than receive the therapy at TPT's Denbigh location.[17] There is no record in evidence of a physician office visit or a prescription related to this essentially separate, unrelated physical therapy for the knee.[18] The court is concerned that there appears to have been a conscious effort on the part of Trevino to hide the fact of this incident. The fall down the stairs and the subsequent related medical treatment came to the court's attention only because the bills for the knee treatments were, it was testi-

16. Trevino first attended physical therapy on September 21, 1992. The court finds that the physical therapy sessions through December 31, 1992 were reasonably necessary, for a total of slightly more than 13 weeks. This is more than the 6 to 12 weeks for primary physical therapy mentioned by Dr. Cardea. The total amount charged for this reasonably necessary physical therapy was $2,726.50. (Ex. 35).

17. These two locations are separate offices of the same corporation, Tidewater Physical Therapy, Inc.

18. It should be noted, however, that Trevino would have had to have some prescription for physical therapy at that time.

fied, mistakenly submitted as part of Trevino's outstanding medical bills related to the accident. In all, Trevino underwent treatment related to the fall down the stairs at WPT from February 12th until March 11th, 1993, at a total cost of $914.24. After this period, Trevino then returned to TPT for physical therapy related to his back. Dr. Cardea opined in relation to the fall down the stairs:

> It would appear to me that if a patient had this type of limited range of motion and was failing physical therapy that any type of secondary injury, i.e., falling down stairs or a wrestling accident [in the case of Charity] would put further strain on the back and could exacerbate an underlying condition. There is no way that one can wrestle and fall or fall down stairs enough to sprain a wrist or a knee ligament, and not have some twisting or compression injury to the back. This may have been as much as a fall as occurred on the boat.

(Report at 4). The court agrees that this fall down the stairs clouds the issue of the cause of any subsequent ongoing pain suffered by Trevino, particularly in light of the fact that Trevino testified that he never reported this incident to the doctors treating him as a result of the accident made the basis for this suit. Thus, these doctors' contemporaneous opinions were therefore based on at best incomplete facts.

### e. Dr. Arthur W. Wardell

In addition to Dr. Morales, claimant Trevino relied at trial on the expert testimony of Dr. Wardell, who examined Trevino on February 3, 1993.[19] Dr. Wardell, an orthopedic surgeon, received his M.D. from Cornell University in 1975. He has been in private practice in Portsmouth, Virginia, since 1980. He has held various memberships and posts in medical societies and on hospital committees. He was president of the Portsmouth General Hospital medical staff in 1988 and of the hospital's board of directors from 1988 to 1990. Dr. Wardell was board-certified in orthopedic surgery as of 1981, and is a member of the AMA.

Dr. Wardell examined Trevino at the February 3rd visit and the examination was limited to Trevino's back. Dr. Wardell found tenderness in two areas of the lumbar back. He found Trevino to be standing "with his hip flexed and his back flexed in kind of a mild semi crouched position." (Tr. at 10). Flexion was moderately restricted. Dr. Wardell performed a straight leg raising test that was positive for back pain but *not* for radiating leg pain. (Tr. at 28–29). Dr. Wardell found Trevino's knee and ankle reflexes and strength and sensation to be normal. Dr. Wardell ultimately diagnosed Trevino's condition as "chronic lumbosacral spine sprain which aggravated preexisting degenerative arthritis in his back." (Tr. at 14). Dr. Wardell testified that Trevino's condition was related to his fall on the boat in September of 1992 and that Trevino did not have an ability at the time of the exam to return to work as a first mate on a fishing boat. Dr. Wardell recommended a Functional Capacity Evaluation, discussed in more detail below, which caused him to later reach the conclusion that Trevino's condition was permanent.

On cross-examination, Dr. Wardell stated that he did not see anything on the MRI that he would characterize as a herniated disc. He admitted that in his notes made on February 3rd, he did not say anything about the spine sprain aggravating a preexisting degenerative condition; rather, he recorded the diagnosis only as a chronic lumbosacral spine sprain. There was also a considerable amount of testimony about whether a fall down the stairs could cause the back problems Dr. Wardell felt existed. Dr. Wardell, who was never told of a fall down the stairs by Trevino, stated that if the patient had progressed and reported recovery and then had a setback after such a fall then "the fall would be a component in the future symptoms." (Tr. at 46). As to the permanency of Trevino's condition, Dr. Wardell placed great weight on the persistence of the patient's complaints and the fact that the functional capacity evaluation done eleven months after the fall on the ship showed limitations. (Tr. at 25–26). Dr. Wardell stated that his opinion was based on the history given to him

19. Trevino was referred by his lawyer and Dr. Morales for a second opinion. (Ex. 34).

and might differ if was not given all the appropriate history. (Tr. at 34).

The court finds that Dr. Wardell's diagnosis of an essentially permanent back sprain differed greatly from both that of Trevino's other expert, Dr. Morales, who diagnosed a herniated disc, and from all of the other physicians who testified that a back sprain or strain normally resolves over time. For example, Dr. Cardea stated that the "majority of pain due to a routine fall of this nature will be gone in 6 weeks", (Report at 2), and also stated that "It is my impression that no contusion or injury will remain at this level of symptom for a year. In other words, even spine fractures get better over a period of time." (Report at 3). Dr. Phillips testified at his deposition that in the absence of radiating pain indicating a herniated disc a low back strain "over time ... would resolve." (Tr. at 10). Dr. McAdam stated bluntly that a back strain or sprain is "never" a permanent condition and that such a condition will resolve in two to three months. (Tr. at 18). Even Dr. Morales was of the opinion that muscular strain is "not a permanent condition." (Dep. at 75). The court finds that a preponderance of the evidence in this case supports its finding that a back strain or sprain is not a permanent condition and that such an injury will resolve within a few months. The court also finds that Dr. Wardell's credibility was not enhanced by his testimony that all of the testing and treatment ordered by Dr. Morales was reasonable (although he himself would not have ordered all of the tests). (Tr. at 34). Based on its observations in court of the witnesses, the testimony of the other experts, and the actual facts affecting Trevino's physical condition, the court rejects Dr. Wardell's diagnosis and prognosis.

### f. Functional Capacity Evaluation

Beginning on July 26, 1993, and running for a total of three days, a Functional Capacity Evaluation ("FCE") was performed on Trevino by occupational therapist John Meyer of the Riverside Rehabilitation Institute. Meyer testified at trial, and his report was submitted as Exhibit 32. Trevino was referred for the FCE by Dr. Morales, according to the report. Claimant Trevino relies heavily on this report, which found Trevino was capable of light work, but also found he had decreased lifting and bending and other capabilities and would not be able to return to the duties Trevino had told Meyer were required of him as a commercial fisherman.

The evaluation begins with maximum voluntary effort testing, designed to see if a subject is giving his or her best effort or "holding back." Trevino passed these tests, but as was pointed out on cross-examination and then redirect, these tests do not measure efforts with regard to the injured part of the body, in this case the lower back. That is because the pain can throw off the results. Instead, effort is measured on uninvolved muscles and it is theorized that if the patient gives his best effort on these tests he or she will give his best efforts on tests involving the injured body part.

The FCE consists of a series of physical activities designed to replicate and test the subject's ability to perform job-related activities. Counsel for the parties dispute whether the FCE is objective or subjective. Counsel for Trevino maintain that the FCE is an objective measure of functional impairment. (Reply Brief at 7). Counsel for the vessel owners maintain that inasmuch as the evaluation is based in large part on observations of Trevino's efforts and his complaints of pain the process is subjective. (Post–Trial Brief at 21). In the court's view, based on the overall testimony of Meyer, whom the court found credible, the FCE may be a *relatively* objective measure of functional impairment because of soft-tissue injury but it, like most determinations in this elusive medical area, is inherently subjective because it largely relies on the patient's subjective complaints and exhibited pain behavior. For example, Meyer summarized his observations of Trevino as follows:

This injured worker was evaluated for his functional capabilities over a three day period. He was always on time and stayed the entire day. He had good worker traits and demonstrated the ability to be feasible for employment. His maximum voluntary effort tests and his behavior indicated that he was giving a good effort during the

evaluation. It is my opinion that this is an accurate depiction of his current capabilities. He did have some variances with his reports of increased pain as compared to his rating of his pain. His explanation was [sic] that he was having increased pain, did not coincide with changes in his pain behaviors. His behavior was more consistent with his pain scale rating which did not change. It appeared that this injured worker may have been describing more pain than he experiencing during the evaluation.

(Ex. 32). This excerpt gives some indication of the uncertainties inherent in FCE's reliance on observations and reports of pain. The court notes that in his testimony on cross-examination, Meyer stated that when Trevino actually began the lifting and carrying exercises "[i]t appeared that he was holding back at that time". (Tr. at 28). This "holding back" is consistent with the independent impression of Dr. Phillips, discussed previously, that Trevino was voluntarily limiting his lumbar motion. The court is not as confident in the FCE results as counsel for Trevino, although as stated the court finds Meyer himself to have been both candid and credible.

The major problem with Trevino's reliance on the FCE, however, is that the required causative link with the collision and fall to the deck some eleven months earlier just is not proven by the claimant, even if the court accepts the procedure as truly indicative of a functional impairment in late July and early August of 1993. It is undisputed that Trevino had degenerative disc disease in his back that was not a result of any accident. It is also undisputed that Trevino had a previous back problem necessitating his absence from work. It is also undisputed that Trevino had a fall down some stairs *after* the accident but *before* the FCE, and this fall was serious enough to warrant nearly a month's physical therapy for a sprained knee and wrist. Meyer did not and could not opine that the impairment he felt existed was caused by the collision in September 1992. Moreover, this court rejected the opinion of Dr. Wardell. In short, the court finds that to the extent Trevino had any functional limitation in late July and early August of 1993, which the court

does not necessarily find, there is insufficient evidence of a causal link to the accident in September 1992 and the court finds to the contrary.

### g. Dr. Richard B. McAdam

The defendants relied largely on the expert testimony and report of Dr. Richard B. McAdam, who performed an independent medical exam on both claimants on behalf of the defendants.

Dr. McAdam is a board-certified neurosurgeon. He received his medical degree from the University of North Carolina in 1967. He subsequently interned in general surgery at the University of Cincinnati and served as a resident in neurosurgery at Emory University. He served two years in the Navy as a neurosurgeon at Portsmouth Naval Hospital in the 1970s, is licensed in Virginia and North Carolina, and has an academic appointment at Eastern Virginia Medical School effective 1978. He has clinical appointments at several area hospitals and is a member of a number of medical societies, including the AMA. Eighty percent of Dr. McAdam's practice deals with spinal problems, and he has performed several thousand back surgeries. Twenty percent or more of his practice relates to individuals who have back problems because of degenerative disease. Dr. McAdam testified that less than one percent of his practice involves independent medical exams, amounting to about eight or ten per year.

Dr. McAdam examined Trevino on October 8, 1993, and eventually he also reviewed all of the X-rays, MRIs, and other test results. Dr. McAdam's exam was consistent with those given by the emergency room at Hampton General and Dr. Phillips, and his straight leg raising test results were consistent (negative for leg pain) with all of the straight leg raising tests given save those given by Dr. Morales. Dr. McAdam found no motor, sensory, or reflex abnormalities, and strength, squatting and raising, walking on heels and toes, pedal pulse, and gait were all normal. Dr. McAdam found no paraspinal muscle spasm. Dr. McAdam, like Dr. Phillips and Mr. Meyer, detected what could

alternatively be characterized as "holding back" or an excess of caution:

> When he stands up and attempts to bend over and touch his toes he states he can't bend his back, but when encouraged he can bend to the horizontal.

(Ex. 58). Dr. McAdam reviewed all of the records and his testimony using the lumbar MRI scans and myelogram was credible and graphically clear to the court that there was no herniated disc or nerve root compression present.[20] (Tr. at 22–26). Dr. McAdam opined that degenerative disc disease can cause pain, particularly low back pain, but that leg pain (which does not migrate from side to side) overwhelms back pain in the case of a true herniated disc. Dr. McAdam thus felt that Trevino's history was also inconsistent with a herniated disc. Dr. McAdam was of the opinion that Trevino suffered a lumbosacral strain, which he described as follows:

> It's strictly a muscular back problem and should be well resolved by the time I saw him, and in fact was resolved by the time I saw him.

(Tr. at 18). As previously recounted in this opinion, Dr. McAdam's opinion was that back strains are "never" a permanent condition. In regards to Dr. Wardell's opinion, the following exchange took place:

> Q. Is it possible that the low back strain aggravated the preexisting degenerative condition?
>
> A. I don't think so, Because—the reason that I say that is basically twofold. The first is when I examined him, his exam was normal. That's pretty heavy weight against any aggravation of an underlying degenerative process.
>
> The other thing is that the MRI scan and especially the myelogram, showed absolutely no evidence of any nerve root distribution. So—and these are pretty good tests we interpret this from. They showed no evidence of any acute trauma. I would say in this case there is no evidence that his strain aggregated [sic]

the underlying degenerative process, for the objective reasons that I told you.

(Tr. at 19). The court in general finds Dr. McAdam to have been a clear and credible witness. The court finds that this particular testimony is essentially consistent with the findings and diagnosis of Dr. Phillips, and all of the physicians who testified that back strains are not usually permanent in nature, and the court accepts this testimony. The court accordingly finds that Trevino has not proven that he suffers from a permanent back strain related to the collision made the basis for this suit.

Dr. McAdam's report recorded his opinion that

> [Trevino] is indeed not disabled to work, he can work regularly without any restrictions. His complaint of pain is simply not supported by any reasonable objective data in the voluminous record noted above [including the FCE], nor is it at all supported by my examination today. I see no indication for any further studies.

(Ex. 58). Dr. McAdam testified, but did not earlier include in his written report, that Trevino (and Charity) were probably "malingering." The court does find that this is a possibility in this case. But in any event, Trevino has not shown either 1) that he has a permanent disability, or 2) that any disability was causally related to the collision of September 8, 1992.

Dr. McAdam also testified that in his opinion it is felt to be an unethical practice to refer patients for tests or treatments at facilities in which the physician has an ownership interest. He stated that this "is the reason that most of us don't participate in that sort of thing. It is the reason they don't let physicians sell drugs in drug stores, the same sort of thing." (Tr. at 112).

### h. Dr. John A. Cardea

Because of this stark difference of opinions between those physicians testifying for each side in this matter the court appointed Dr.

---

**20.** The court made an interim finding that there was no disc herniation prior to the records being sent to Dr. Cardea. The dispute at this point had become whether there exists a permanent disability, as maintained by Dr. Wardell, based on an essentially permanent back strain aggravating the degenerative disease.

Cardea pursuant to Fed.R.Evid. 706. This opinion has already recounted most of Dr. Cardea's opinions on the course of treatment which Trevino underwent. Dr. Cardea, who is the Chairman of the Department of Orthopaedic Surgery at the Medical College of Virginia, found that all of the expensive medical tests and procedures ordered by Dr. Morales were not reasonably necessary, save the first lumbar MRI and "possibly" the first epidural cortisone injection. Dr. Cardea found the physical therapy past 6–12 weeks excessive in light of the reported lack of progress. (The court notes again that Trevino made initial progress at physical therapy while under the care of Dr. Phillips—it was only after switching to Dr. Morales that leg pain was consistently complained of and reported progress came to an end.)

Dr. Cardea, in reviewing the medical records, felt in addition that "I am not convinced from any office notes that this [test done by Dr. Morales] was a true positive straight leg raising test on Mr. Trevino." (Report at 2). Dr. Cardea was also "concerned that Dr. Morales kept finding spasm in Mr. Trevino. However, Dr. Phillips never found spasm [he actually did find spasm initially, which then was not present at subsequent examinations] and Dr. McAdams [sic] did not find spasm in his final evaluation." (Report at 7–8). Dr. Cardea stated that "In my opinion there is a great area of secondary gain [meaning the potential for financial gain], and this can be ascertained by the physicians doing the examination and trying to coordinate not only the complaints of the patient, but the degree of pain, loss of motion, radiculopathy with the positive physical findings." (Report at 7). Because he had not so physically examined the patients, Dr. Cardea was ultimately disinclined to offer an opinion on the extent of injury and the degree of permanent disability, if any, suffered by Trevino (or Charity). He stated, however, that "I would be very leery of this pain as being as bad one year following the injury, as it was the first couple of weeks following the injury." (Report at 8).

The court finds Dr. Cardea's report to be even-handed and credible. Accordingly, the court accepts the findings of Dr. Cardea with

regard to which procedures and treatments were medically necessary. The court also finds that, consistent with Dr. Cardea's suspicions and the negative findings of all the other clinicians, that Trevino did not have a true positive straight leg raising test while under the care of Dr. Morales.

### i. Other Witnesses

Trevino presented Peter Milberg, a certified vocational counselor and Charles DeMark, certified rehabilitation counselor. These witnesses attempted to quantify the amount of earning loss suffered by Trevino on the basis provided by Dr. Morales that he could no longer return to work as a commercial fisherman. Because the court does not find that Trevino has suffered a permanent disability caused by the collision that prevents the his return to commercial fishing, the court does not reach the issue of any permanent loss of earning capacity.

### j. Summary of Findings

The court finds that, as a result of the collision of September 8, 1992, Trevino suffered a back strain which was not permanent in nature but a temporary condition. The court finds that Trevino clearly improved to the point of sometimes reporting no pain at all by the third week of October, 1992. The court finds that, giving Trevino the benefit of the doubt as to the amount of time which Dr. Cardea stated that back strains normally resolve, the back strain from the collision was clearly resolved by the end of December, 1992.

The court finds that Trevino switched from Dr. Phillips to Dr. Morales because of litigation issues and not because of a lack of progress under Dr. Phillips' care. Indeed, the record is clear that Trevino steadily progressed until the switch in physicians. The court further finds that most of the procedures and treatments ordered by Dr. Morales were medically unreasonable and unnecessary. This court finds the running up of the medical bills in this case to be deplorable and will not sanction the recovery of expensive charges for unnecessary procedures. These procedures and the charges therefore appear to have been designed to enrich those

who owned a financial stake in the facilities involved and to increase the potential damage award in this lawsuit.

The court finds that Trevino was injured in a fall down stairs sometime after December 1992 and before February 12th, 1993. This incident was never reported to Trevino's attorney or to Dr. Wardell, who provided testimony that Trevino suffered a permanent disability because of the collision at sea. The court further finds it to be suspicious at the least that the physical therapy for this injury was conducted at a different location and under a different account number than that therapy for his strained back. The court further finds that the undisputed evidence shows that Trevino had a longstanding degenerative back condition unrelated to the collision, and that Trevino fully recovered from an earlier back strain two years prior to this accident. The court also finds that Trevino was perceived at different times by Dr. Phillips, Mr. Meyer, and Dr. McAdam to be "holding back" with regard to his capabilities or exaggerating his pain complaints. The court finds it unnecessary to determine whether this was intentional malingering, as testified to by Dr. McAdam.

The court finds generally credible the testimony and reports of Drs. Phillips and McAdam that Trevino suffered a back strain which was either resolving (Dr. Phillips) or had resolved (Dr. McAdam) at the time of their examinations. In essence, the court finds that Trevino has failed to prove by a preponderance of the evidence his contention that he was permanently disabled as a result of the accident. Moreover, the court finds that at most he suffered a temporary muscular strain of the back which had resolved insofar as this incident is concerned before the end of the year in 1992. Accordingly, the court will award Trevino damages for all of the necessary medical expenses, and the other components of maintenance and cure, reasonably expended through December 1992. A complete breakdown is provided in the "Damages" section *infra*.

### 2. *Claimant Charity*

There are remarkable similarities between the cases of Trevino and David Charity. To a large extent, the testimony of the experts who were involved in both cases are similar as are the findings of this court. In general, Charity's case for permanent disability is even less well-proven than Trevino's.

David Charity was thirty-seven years old at the time of trial. Charity is a native of Massachusetts. He testified that he had not completed the tenth grade and that he was working on his general equivalency degree. He has worked in maintenance and cleaning capacities at various jobs. He worked in shipbuilding until he contracted emphysema and could not withstand the smoke. He first worked on a scallop boat around 1980. He then began work as a bricklayer, carpenter, and painter sometime around 1985. He subsequently worked at a variety of other jobs. Charity had been back in Virginia for two weeks at the time of the accident. He had just begun work as a deck hand on the F/V CAPT. WOOL on September 5th, 1992.

At the time of the collision on September 8, 1992, Charity, who had seen the other vessel approaching, yelled for Trevino and was running to the stern. Charity was knocked into the steel galley support. He felt immediate pain in his back only. Charity reported this pain to Trevino and the captain.

Unlike Trevino, Charity did not seek medical attention immediately upon the return to Hampton. Rather, he waited until September 14th, nearly a week after the accident, and four days after Trevino sought medical attention. Like Trevino, Charity went to Sentara Hampton General's Emergency Room. The "Emergency Assessment Triage Sheet" reflects a complaint of lower back pain. Charity also complained of some radiation into the *left* leg. (Ex. 36). X-rays of the lumbar region showed "moderately advanced" degenerative joint disease, mainly at L4–5 with "large anterior and posterior osteophytes," or bone spurs. (Ex. 36). The diagnosis was "acute back strain & contusion." (Ex. 36). Charity was prescribed bed rest for two days and pain medication and referred to his own doctor.

At the time of trial, Charity had been back at work in Massachusetts for approximately three months. He was working in mainte-

nance and cleaning at a McDonalds restaurant eight hours per day and at a Lincoln–Mercury dealership for one hour each day. Charity submitted tax returns showing incomes of $17,643 in 1988, $12,849 in 1989, $6,722 in 1990, and $1,522 in 1991. Significant portions of this reported income is from unemployment compensation.

### a. Dr. Phillips

On September 24, 1992, Charity was examined by Dr. Phillips. Like Trevino, Charity was referred to Dr. Phillips by his employer or their insurance adjustors. Charity complained of low back pain with no indication of radiation into the legs. Charity confirmed on cross-examination at trial that he never told either the emergency room nor Dr. Phillips about any pain radiating into the *right* leg. Examination showed tenderness in the lower back, no muscle spasm, and some slight limitation of flexion and extension. There was no weakness, numbness, or atrophy in the lower extremities. Gait, stance, and reflexes were all normal. There was no sensory deficit or motor weakness. (Ex. 37). Dr. Phillips was "reasonably certain" that he gave Charity a straight leg raising test that was normal, otherwise he would have suspected a herniated disc. (Dep. at 5–6). Based on his exam and the X-rays, Dr. Phillips diagnosed a "back strain aggravating, previous asymptomatic degenerative joint disease at L4–5." (Ex. 37 & Dep. at 5). Dr. Phillips believed Charity should stay out of work for one month and return as needed. Dr. Phillips also prescribed some pain medication and recommended that Charity continue his chiropractic care that he had begun two days previously. Charity never returned to Dr. Phillips.

### b. Dr. Burt H. Rubin

Dr. Rubin was a chiropractor who treated Charity beginning on September 22, 1992 and continuing through December 24, 1992. Dr. Rubin practices at Peninsula Chiropractic in Hampton and testified at trial. Dr. Rubin is a board certified chiropractic orthopedist.

At the initial visit on September 22nd, Charity complained of lumbosacral pain, which radiated to the left side of his back. Charity gave as the purpose for the visit "lower back pain." (Ex. 38). The pain was aggravated by bending and lifting. Charity also complained of headaches, loss of sleep, and stress. Dr. Rubin examined Charity and noted tenderness and spasm. Tests revealed that flexion produced moderate back pain, and extension, which was limited to 50% of normal, produced severe back pain. Reflexes, motor strength, and sensory exams were normal. Bechterew's test (leg extension) was positive on the right for back pain. Kemp's test (a procedure where the subject stands and leans back) also caused back pain. Dr. Rubin made an initial diagnosis of "acute traumatic spastic inflammatory lumbosacral strain/sprain with associate nerve root injury resulting from a hyperextension tight force." (Ex. 38).

Charity returned three times per week to Dr. Rubin, a total of 35 visits. Charity complained of leg pain on only two occasions, October 6th and December 2nd, 1992. Dr. Rubin had Charity's X-rays sent away for an analysis which remarked upon the previously noted degenerative disease but stated that there was no evidence of traumatic injury. (Ex. 38). Rubin testified that there was continued improvement under his care from September until December, when progress stalled. Upon Charity's last examination on December 24th, Charity's range of motion was normal but still produced reports of pain. Bechterew's test was now normal. Dr. Rubin discharged Charity to the care of Dr. Morales as having reached maximum chiropractic improvement. Dr. Rubin testified that his end diagnosis was that Charity had chronic lumbosacral pain caused by the accident. In essence, Charity could move forward and back as much as he should but he still complained of pain. The court finds that this course of chiropractic treatment was reasonably necessary and causally related to injuries suffered in the collision of September 8, 1992.

### c. Dr. Morales

Charity testified that he was referred to Dr. Morales by his attorney. Dr. Morales claims that he was referred by Dr. Rubin.

Dr. Rubin's letter to Charity's attorney also implies that he (Dr. Rubin) made the referral to Dr. Morales. Whatever was the case, Charity first visited Dr. Morales on November 3, 1992.

As was the case with Trevino, Dr. Morales made numerous positive findings that were not duplicated by other clinicians. In addition to pain radiating down the *right* leg, these included limping gait, decreased ankle jerk reflex, a positive straight leg raising test on the right leg, decreased sensation at the L5–S1 dermatome, and an atrophied right calf.

After this first examination on November 3rd, Dr. Morales noted the "persistence of the patient's symptoms" and he recommended "appropriate neurodiagnostic testing." (Ex. 42). As was the case with Trevino, Dr. Morales' facilities performed the tests. As was the case with Trevino, the claims for those tests not considered indicated by Dr. Cardea have been withdrawn. A complete thoracic and lumbar thermogram was performed on November 19, 1992. The cost for this procedure was $675.00. The report purports to indicate a result "consistent with a left S1 sensory nerve fiber irritation with some cross-over to L5." (Ex. 39). The court finds this test to have been unnecessary.

On this same date, both thoracic and lumbar MRIs were also performed. Once again, as with Trevino, there is an indication under "History" that Charity had mid-back pain, though this report of mid-back pain does not appear elsewhere. Unsurprisingly, the thoracic MRI was normal. It is also interesting to note that the leg pain was now related in the history to be down the *left* leg again. (Ex. 40). The court again relies on the opinion of Dr. McAdam to find that migrating reports of pain indicate muscular pain only, consistent with a back strain. Dr. Washburn read the lumbar MRI to indicate protruding discs at L3–4, L4–5, and L5–S1. (Ex. 40). He also noted spondylosis (degenerative arthritis) but found no evidence for a herniated disc. (Ex. 40). Based on the report of Dr. Cardea, the court finds the lumbar MRI to have been reasonably necessary, but finds the thoracic MRI to have been completely unnecessary. The cost for each was $1,060.00. Dr. Morales' facility also performed an EMG and nerve conduction study on Charity on November 19th. The cost for this procedure was $420.00. This claim has since been withdrawn. The EMG needle examination was negative, while the nerve conduction study showed findings "compatible with a mild compression of the S1 nerve root on the left." (Ex. 41). As was the case with Trevino, in light of the lumbar MRI procedure, the court finds this test to have been unnecessary.

Dr. Morales testified as to the significance of these results. In his opinion, the protruding discs were the cause of Charity's pain, and he opined that they were caused by the accident (or some other recent injury) because there was no evidence of disc dehydration that would have occurred if the condition was older in time. (Dep. at 16–22). Dr. Morales felt that the condition was likely to be a permanent one. (Dep. at 22).

### d. Dispute Over Dr. Morales' Permanency Opinion

There was a heated dispute between the parties as to whether a permanency opinion by Dr. Morales had been recently fabricated and not disclosed to counsel for the defendants. When Dr. Morales opined at his *de bene esse* deposition of February 25, 1994 that Charity had a permanent disability, the defendants objected because no such information had been previously disclosed to them. The defendants had been provided handwritten office notes dated January 11, 1993, which related only to an injury to the left elbow suffered in a fight, of which there is more below. However, counsel for Charity responded to the objection at the deposition by stating that findings regarding permanent repetitive lifting limitations of 25 lbs., occasional lifting of 35–50 lbs., and medium work only were contained in the January 11th notes. It turned out that these entries under January 11th, 1993 were actually the result of an exam given by Dr. Morales only two days before the deposition on February 23, 1994, but entered under and added to the January 11th heading more than year after that visit. The shipowners in the meantime

had properly obtained a copy of the records from the office of Dr. Morales which clearly did not contain such entries. Dr. Morales had not seen the patient since the prior visit of January 11, 1993, but in 1994 made the entries with his January 1993 notes and thereby provided the opinion of permanent disability. Although it is clear to the court that this situation represents a hastily-arranged attempt to make a record of permanent disability relating back over a year on the even of trial, and thus the opinion is lacking in probative value, this court stops short of finding that there was an attempt on the part of counsel and Dr. Morales to intentionally falsify records or to deliberately mislead the defendants or the court. Rather, viewed most charitably, the court is presented with a glaring example of the sloppy record keeping practices of Dr. Morales, which is the reason he gave which prevents him from practicing in the hospital of the largest health provider in this region. Such incidents clearly create in the court's mind, however, a lack of trustworthiness of Dr. Morales' records and thus his opinions.

### e. The Fistfight

Charity testified that he got into a fight twice in one day on January 3, 1993, in one of which he wrestled a man to the ground and was injured enough himself to seek emergency treatment at Sentara Hampton General Hospital. The January 3, 1993 report from the emergency room indicates that Charity sustained a laceration requiring stitches. (Ex. 36). On January 11th, 1993 Charity returned to Dr. Morales and complained of a sore left elbow as a result of the fight as well.

### f. Charity Had Recovered by the End of December, 1992

The court finds that the foregoing evidence is consistent with Charity having recovered from back strain by the end of December, 1992. First of all this finding is consistent with Charity's initial improvement and reaching maximum chiropractic improvement by December 24th. Secondly, this finding is consistent with Charity wrestling a man to the ground on January 3rd and suffering an injury to his elbow and lacerations to his mouth in a fistfight. Third, the opinions of the Drs. Phillips, McAdam, and even Dr. Morales that back strains typically resolve within a matter of weeks or months supports such a finding.

Finally, perhaps the strongest evidence of Charity's recovery is the fact that he never sought any treatment for his back whatsoever (aside from the visit to Dr. Morales of January 11th, in which he complained *inter alia* of his sore elbow) after this time until he was served on April 29, 1993 with the complaint in the limitation of liability action. Charity never returned to Dr. Phillips after the initial visit; he had a total of three visits with Dr. Morales prior to the fourth and final visit in which Dr. Morales pronounced Charity permanently disabled on the eve of the first trial date in February 1994; and then he never sought another doctor's care for nearly five months. Charity moved to Taunton, Massachusetts shortly after the fistfight incident. It was only on May 7, 1993, eight days after he was served with the lawsuit brought by the ship, that Charity sought more treatment from a chiropractor in Massachusetts. It is clear to the court that this need for further chiropractic treatment did not arise in the context of an actual ailment related to the collision, but rather solely in the context of the litigation related to the collision. Charity was released from this second course of chiropractic care on December 22, 1993, for having reached maximum chiropractic improvement. Charity eventually sought out the services of a neurosurgeon and orthopedic surgeon while in Massachusetts, as well as the chiropractic care. More X-rays, EMGs and other tests were done. The EMG and nerve conduction test done on June 18, 1993 was normal. None of these doctors provided Charity with a diagnosis of permanent disability. Indeed, Charity at trial explained his lack of treatment on the fact that the welfare authorities in Massachusetts would not certify him as disabled. The court finds that none of this medical care, about which there was little evidence, was medically necessary. Instead, the conclusion is inescapable that this care was entered into solely for the purposes of this litigation. This court completely rejects the last minute opinion of

Dr. Morales that Charity suffered from a permanent disability related to the accident.

### g. Dr. McAdam

This court's opinion is supported by the independent medical examination of Charity done by Dr. McAdam, which was completely at odds with the findings made by Dr. Morales. Dr. McAdam examined Charity on December 3, 1993, and also reviewed the medical records from all of the aforementioned health care providers. Dr. McAdam found the complaints of leg pain to be vague and bilateral in nature. He found there to be no bowel or bladder symptoms, and no other weakness or numbness. Range of motion of the entire neck and spine was normal. The neurological exam was normal—no focal, motor, sensory, or reflex abnormalities. Charity was able to squat and rise, walk on heels and toes, and bend over and touch his toes. As straight leg raising test was negative for leg pain. Pedal pulses were normal in both feet. There was no paraspinal muscle spasm. There was no motor weakness; strength was rated 5 out of 5. The sensory exam was intact over all dermatomes. Reflexes were 2+ equally in the upper and lower extremities and there were no pathologic, absent, or asymmetrical reflexes. (Ex. 59).

Dr. McAdam felt that the lumbar MRI was "basically normal. [Charity] has some mild degenerative changes, but certainly no herniated intervertebral disk." (Ex. 59). Dr. McAdam concluded that Charity had a lumbosacral back strain. McAdam stated that:

> I feel there is a great deal of functional input to this patient's exam and I am unable to substantiate objectively any significant disability in this man's case. It would be my recommendation that he be placed on a good back exercise program and returned to the work force. He should resolve this back strain without any permanent disability.

(Ex. 59). As with Trevino, in his testimony at trial McAdam opined that Charity was probably malingering. Clearly, Charity was affected by secondary gain. The court does find that Charity did not suffer a permanently disabling injury as a result of the collision

and the court now credits the views expressed by Dr. McAdam and finds them to be consistent with the findings of Dr. Phillips. It was because of the sharply differing opinions of the two sides' experts in Charity's case as well as Trevino's, however, that the court enlisted the assistance of Dr. Cardea under F.R.E. Rule 706.

### h. Dr. Cardea

Dr. Cardea proffered fewer specific opinions in the case of Charity than he did in the case of Trevino. He noted that it was "interesting" that Dr. Phillips found no muscle spasm in Charity "in the first examination after the injury" and that "Mr. Charity had no complaint of leg pain." (Report at 3). Dr. Cardea found the first lumbar MRI only to be appropriate. Dr. Cardea found the first lumbar MRI only to be appropriate. Dr. Cardea noted the degenerative disease present but also stated that there was "no evidence on the MRI of nerve root entrapment." (Report at 4). As with Trevino, Dr. Cardea felt that the EMGs and nerve conduction studies were not appropriate. Dr. Cardea noted that epidural steroids were more warranted on Charity since he had some neurological evidence of an S1 radiculopathy. Yet Dr. Morales only provided the epidural steroid treatment to Trevino, even though it was more arguably more warranted in Charity's case. Dr. Cardea felt that a "wrestling accident could put further strain on the back and could exacerbate an underlying condition." (Report at 4). Dr. Cardea felt that the physical therapy was excessive for both Charity and Trevino, as excerpted from his report *supra* in the section on Trevino. As with Trevino, Dr. Cardea would not speculate on the permanency of any condition in the absence of physically examining Charity himself.

### i. Summary of Findings

As with Trevino, because the court finds that Charity has not proven that he has suffered any permanent disability as a result of the accident made the basis for this suit, the court finds it unnecessary to assess the testimony of Mr. Milberg and Mr. DeMark regarding the effect such a disability has on

one with Charity's background and earning potential.

The court finds that Charity suffered a lumbosacral back strain as a result of the collision. Like Trevino, Charity had improvement until he came under the care of Dr. Morales. Once again, the court finds as a fact that unnecessary tests and procedures were ordered. The permanent disability opinion was obtained on the eve of trial, and the notes relative thereto were backdated over a year to January 11, 1993. Clearly this appears litigation-driven. The court simply attaches very little if any weight to the findings of Dr. Morales. As was the case with Trevino, the other physicians involved in Charity's case consistently found that he suffered from a back strain. The court further finds that Charity had a preexisting degenerative back condition which was initially aggravated. The court finds that Charity's complaints of leg pain were not made to all of the health care providers who treated him, and, when made, they were vague, intermittent, and migrated from leg to leg. As such, the court finds that any leg pain was related to subjective muscular pain, not from any objective spinal abnormality.

The court finds that all of the medical expenses related to this back strain after Charity was discharged from chiropractic treatment on December 27, 1992 were not reasonably necessary. The court finds that any treatment incurred after December 27, 1992 was not proximately caused by the accident made the basis for this suit, but was prompted by litigation. Charity himself never returned to any health care provider until he was served with the papers in the lawsuit almost five months later.[21] Charity has proven by his own actions in eschewing treatment and wrestling other men to the ground in early January of 1993 that he was not permanently or even temporarily disabled after December of 1992. In this case, Charity's own actions speak louder than Dr. Morales' words. All of Charity's sudden subsequent medical treatments after the suit was filed appear to be no more than a transpar-

ent attempt to obtain an opinion that he was permanently disabled. When he was unable to garner such a medical opinion while living in Massachusetts, Charity returned for the February 23, 1994 visit to Dr. Morales, on the eve of trial, to obtain the same. This court rejects that opinion. The court finds as a fact that claimant Charity was malingering after December of 1992 insofar as his back was concerned.

## II. Damages

■ One legal issue arose in regards to damages for maintenance. "Maintenance and cure provide a seaman who becomes ill or injured in the service of his ship lodging, board, and medical expenses until he reaches maximum recovery." *Williams v. Kingston Shipping Co.*, 925 F.2d 721, 723 (4th Cir. 1991) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)). The parties dispute whether the claimants may be awarded maintenance in addition to lost wages. In the court's view, the issue is not one that is susceptible of a categorical answer either way. Rather, the important restriction is that there can be no double recovery for the same items of loss. "The district court must consider the extent to which [an] award includes amounts which are the substantial equivalent of maintenance and cure in order to avoid a double recovery." *Colburn v. Bunge Towing*, 883 F.2d 372, 378 (5th Cir.1989) (maintenance in case not duplicative because it was the equivalent of food and lodging provided while at sea); *see also Reardon v. California Tanker Co.*, 260 F.2d 369, 371–72 (2d Cir.1958) (maintenance means keep, that is food and lodging; rights to maintenance continue after voyage until cured so far as possible but no double recovery allowed). In the court's view, an award of maintenance in addition to lost wages is not an impermissible double recovery in this case. The evidence suggested that the costs and supplies of the voyages, which would include the costs associated with the food and lodging provided, were deducted from the amounts eventually divided by the crew. In addition, the amounts of main-

---

**21.** With the exception of the January 11th, 1993 visit to Dr. Morales that concerned his injured elbow from the fight as well as his back.

tenance voluntarily paid to the claimants for a period by the F.V. Capt. Wool, Inc., on the order of $12 per day, suggests that the maintenance was paid for the equivalent of the food and lodging provided on ship, and not as a replacement for lost wages. The court will therefore include a similar amount for maintenance in addition to lost wages.

## A. Trevino

■ It was stipulated in the final pretrial order that F.V. Capt. Wool, Inc., has already paid the following amounts to claimant Trevino: (a) maintenance in the amount of $1,095.00 through December 6, 1992 (the court figures this to be $12.59 per day from September 10, 1992, when the ship returned to Hampton); (b) cure in the amount of $2,172.38 to various health care providers. These amounts have been accounted for in the following award. In accordance with the findings contained in this opinion and in consideration of Trevino's injuries and the reasonable medical expenses therefore, the court will award Trevino the following damages:

1) *Reasonable and necessary unpaid medical expenses through December 1992:* $4,130.50 (Tidewater Physical Therapy—$1,299.00; Chesapeake General Hospital—$357.50; MRI of Chesapeake—$800.00; Atlantic Coast Radiology—$260.00; Tidewater Orthopedic Associates—$50.00; Dr. Morales—$1,364.00).

2) *Maintenance:* $314.75 ($12.59 per day from December 7 to December 31, 1992).

3) *Loss of Earnings:* $9,434.00 ($2,358.50 per month for four months, based on highest reported earnings, which were the first eight months of 1992).

4) *Other:* In view of the time elements involved, pain and suffering, and aggravation and inconvenience, the court will award an additional $2,000.00.

5) *TOTAL:* $15,879.25.

## B. Charity

■ It was stipulated in the final pretrial order that F.V. Capt. Wool, Inc., has already paid the following amounts to claimant Charity: (a) maintenance in the amount of $975.00

through November 30, 1992 (the court figures this to be $12.04 per day from September 10, 1992, when the ship returned to Hampton); (b) cure in the amount of $2,388.03 to various health care providers. These amounts have been accounted for in the following award. In accordance with the findings contained in this opinion and in consideration of Charity's injuries and the reasonable medical expenses therefore, the court will award Charity the following damages:

1) *Reasonable and necessary unpaid medical expenses through December 1992:* $2,046.00 (Peninsula Chiropractic—$478.00; MRI of Chesapeake—$800.00; Atlantic Coast Radiology—$260.00; Dr. Morales—$508.00).

2) *Maintenance:* $373.24 ($12.04 per day from December 1 to December 31, 1992).

3) *Loss of Earnings:* $5,881.00 ($1,470.25 per month for four months, based on highest reported earnings, which was $17,643 earned in 1988).

4) *Other:* In view of the time elements involved, pain and suffering, and aggravation and inconvenience, the court will award an additional $2,000.00.

5) *TOTAL:* $10,300.24

## CONCLUSION

The claimants herein were victims not only of an accident but also of a medical-legal system which in this case was oriented more toward rewarding those who enhance injuries rather than those who cure and minimize them.

The court enters judgment in favor of cross-claimant Johnny Ray Trevino and awards damages in the amount of $15,879.25. The court enters judgment in favor of cross-claimant David Charity and awards damages in the amount of $10,300.24.

The clerk is directed to send a copy of this Order to counsel for the parties.

It is so ORDERED.